IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

DEBORAH WINIFRED REED,                          No. 6:15-cv-01924-HZ

                    Plaintiff,

        v.

CAROLYN W. COLVIN,                              OPINION & ORDER
Acting Commissioner of Social Security,

                    Defendant.

Katherine L. Eitenmiller
Mark A. Manning
HARDER, WELLS, BARON & MANNING, P.C.
474 Willamette, Suite 200
Eugene, Oregon 97401

        Attorney for Plaintiff

Billy J. Williams
UNITED STATES ATTORNEY
District of Oregon
Janice E. Hebert
ASSISTANT UNITED STATES ATTORNEY
1000 S.W. Third Avenue, Suite 600
Portland, Oregon 97201-2902


1 - OPINION & ORDER

Alexis L. Toma
SPECIAL ASSISTANT UNITED STATES ATTORNEY
Office of the General Counsel
Social Security Administration
701 Fifth Avenue, Suite 2900, M/S 221A
Seattle, Washington 98104-7075

    Attorneys for Defendant

HERNANDEZ, District Judge:

    Plaintiff Deborah Reed brings this action seeking judicial review of the Commissioner's

final decision to deny disability insurance benefits (DIB).  This Court has jurisdiction pursuant to

42 U.S.C. § 405(g).  I affirm the Commissioner's decision.

## PROCEDURAL BACKGROUND

    Plaintiff applied for DIB on August 28, 2012, alleging an onset date of August 7, 2012.

Tr. 170-78.  Her application was denied initially and on reconsideration.  Tr. 85-96, 114-18

(Initial); 97-113, 124-27 (Reconsideration).

    On March 17, 2014, Plaintiff appeared, with counsel, for a hearing before an

Administrative Law Judge (ALJ).  Tr. 54-84.  On April 10, 2014, the ALJ found Plaintiff not

disabled.  Tr. 14-48.  The Appeals Council denied review.  Tr. 1-4.

## FACTUAL BACKGROUND

    Plaintiff alleges disability based on pain in her back, neck, left shoulder, hands, and

knees, left arm numbness and loss of strength, severe insomnia, use of prescription medications,

arthritis, sciatic nerve pain, and ulcerative colitis.  Tr. 201.  At the time of the hearing, she was

fifty-three years old.  Tr. 60.  She has a GED and has past relevant work experience as a clerk.

Tr. 79-80.

2 - OPINION & ORDER

SEQUENTIAL DISABILITY EVALUATION

A claimant is disabled if unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months[.]"  42 U.S.C. §§ 423(d)(1)(A), 1382c(3)(a).

Disability claims are evaluated according to a five-step procedure.  See Valentine v. Comm'r, 574 F.3d 685, 689 (9th Cir. 2009) (in social security cases, agency uses five-step procedure to determine disability).   The claimant bears the ultimate burden of proving disability. Id.

In the first step, the Commissioner determines whether a claimant is engaged in "substantial gainful activity."  If so, the claimant is not disabled.  Bowen v. Yuckert, 482 U.S. 137, 140 (1987); 20 C.F.R. §§ 404.1520(b), 416.920(b).  In step two, the Commissioner determines whether the claimant has a "medically severe impairment or combination of impairments."  Yuckert, 482 U.S. at 140-41; 20 C.F.R. §§ 404.1520(c), 416.920(c).  If not, the claimant is not disabled.

In step three, the Commissioner determines whether plaintiff's impairments, singly or in combination, meet or equal "one of a number of listed impairments that the [Commissioner] acknowledges are so severe as to preclude substantial gainful activity."  Yuckert, 482 U.S. at 141; 20 C.F.R. §§ 404.1520(d), 416.920(d).  If so, the claimant is conclusively presumed disabled; if not, the Commissioner proceeds to step four.  Yuckert, 482 U.S. at 141.

In step four, the Commissioner determines whether the claimant, despite any impairment(s), has the residual functional capacity (RFC) to perform "past relevant work."  20

C.F.R. §§ 404.1520(e), 416.920(e).  If the claimant can, the claimant is not disabled.  If the

claimant cannot perform past relevant work, the burden shifts to the Commissioner.  In step five,

the Commissioner must establish that the claimant can perform other work.  Yuckert, 482 U.S. at

141-42; 20 C.F.R. §§ 404.1520(e) & (f), 416.920(e) & (f).  If the Commissioner meets his burden

and proves that the claimant is able to perform other work which exists in the national economy,

the claimant is not disabled.  20 C.F.R. §§ 404.1566, 416.966.

THE ALJ'S DECISION

The ALJ initially determined that Plaintiff met the insured status requirements of the

Social Security Act through December 31, 2017.  Tr. 19.  At step one, the ALJ determined that

Plaintiff had not engaged in substantial gainful activity since her alleged onset date of August 7,

2012.  Id.  Next, at step two, the ALJ determined that Plaintiff has severe impairments of

degenerative disc disease with lumbar facet arthrosis, obesity, depression, and post-traumatic

stress disorder (PTSD) with anxiety.  Id.  Then, at step three, the ALJ determined that Plaintiff's

impairments did not meet or equal, either singly or in combination, a listed impairment.  Tr. 19-

20.

At step four, the ALJ concluded that Plaintiff has the RFC to perform light work as

defined in 20 C.F.R. § 404.1567(b), except she is further limited to no more than occasional

kneeling, crouching, crawling, and climbing.  Tr. 20.  She is also limited to no more than

occasional pushing, pulling, and overhead reaching with her left upper extremity.  Id.  She needs

to avoid concentrated exposure to fumes, dust, gases, poor ventilation, and other noxious odors,

as well as moving machinery, heights, and similar hazards.  Id.  She is also limited to simple,

routine tasks.  Id.  With this RFC, the ALJ determined that Plaintiff is unable to perform any of

her past relevant work.  Tr. 41.  However, at step five, the ALJ determined that Plaintiff is able to perform jobs that exist in significant numbers in the economy such as office helper, account representative, and marker.  Tr. 42.  Thus, the ALJ determined that Plaintiff is not disabled.  Tr. 42-43.

## STANDARD OF REVIEW

A court may set aside the Commissioner's denial of benefits only when the Commissioner's findings are based on legal error or are not supported by substantial evidence in the record as a whole.  Vasquez v. Astrue, 572 F.3d 586, 591 (9th Cir. 2009).  "Substantial evidence means more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Id. (internal quotation marks omitted).  The court considers the record as a whole, including both the evidence that supports and detracts from the Commissioner's decision.  Id.; Lingenfelter v. Astrue, 504 F.3d 1028, 1035 (9th Cir. 2007).  "Where the evidence is susceptible to more than one rational interpretation, the ALJ's decision must be affirmed."  Vasquez, 572 F.3d at 591 (internal quotation marks and brackets omitted); see also Massachi v. Astrue, 486 F.3d 1149, 1152 (9th Cir. 2007) ("Where the evidence as a whole can support either a grant or a denial, [the court] may not substitute [its] judgment for the ALJ's") (internal quotation marks omitted).

## DISCUSSION

Plaintiff contends that the ALJ erred by finding her testimony not credible, by rejecting the opinions of her treating physician, by rejecting the opinion of her counselor, and by concluding at step five that she is able to perform jobs that exist in the regional and national economy.

5 - OPINION & ORDER

I. Credibility Determination

The ALJ is responsible for determining credibility.  Vasquez, 572 F.3d at 591.  Once a claimant shows an underlying impairment and a causal relationship between the impairment and some level of symptoms, clear and convincing reasons are needed to reject a claimant's testimony if there is no evidence of malingering.  Carmickle v. Comm'r, 533 F.3d 1155, 1160 (9th Cir. 2008) (absent affirmative evidence that the plaintiff is malingering, "where the record includes objective medical evidence establishing that the claimant suffers from an impairment that could reasonably produce the symptoms of which he complains, an adverse credibility finding must be based on 'clear and convincing reasons'"); see also Molina v. Astrue, 674 F.3d 1104, 1112 (9th Cir. 2012) (ALJ engages in two-step analysis to determine credibility:  First, the ALJ determines whether there is "objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged"; and second, if the claimant has presented such evidence, and there is no evidence of malingering, then the ALJ must give "specific, clear and convincing reasons in order to reject the claimant's testimony about the severity of the symptoms.") (internal quotation marks omitted).

When determining the credibility of a plaintiff's complaints of pain or other limitations, the ALJ may properly consider several factors, including the plaintiff's daily activities, inconsistencies in testimony, effectiveness or adverse side effects of any pain medication, and relevant character evidence.  Orteza v. Shalala, 50 F.3d 748, 750 (9th Cir. 1995).  The ALJ may also consider the ability to perform household chores, the lack of any side effects from prescribed medications, and the unexplained absence of treatment for excessive pain.  Id.; see also Tommasetti v. Astrue, 533 F.3d 1035, 1039 (9th Cir. 2008) ("The ALJ may consider many

factors in weighing a claimant's credibility, including (1) ordinary techniques of credibility

evaluation, such as the claimant's reputation for lying, prior inconsistent statements concerning

the symptoms, and other testimony by the claimant that appears less than candid; (2) unexplained

or inadequately explained failure to seek treatment or to follow a prescribed course of treatment;

and (3) the claimant's daily activities.") (internal quotation marks omitted).

As the Ninth Circuit explained in <u>Molina</u>;

> In evaluating the claimant's testimony, the ALJ may use ordinary techniques of
> credibility evaluation.  For instance, the ALJ may consider inconsistencies either
> in the claimant's testimony or between the testimony and the claimant's conduct,
> unexplained or inadequately explained failure to seek treatment or to follow a
> prescribed course of treatment, and whether the claimant engages in daily
> activities inconsistent with the alleged symptoms[.]  While a claimant need not
> vegetate in a dark room in order to be eligible for benefits, the ALJ may discredit
> a claimant's testimony when the claimant reports participation in everyday
> activities indicating capacities that are transferable to a work setting[.]  Even
> where those activities suggest some difficulty functioning, they may be grounds
> for discrediting the claimant's testimony to the extent that they contradict claims
> of a totally debilitating impairment.

<u>Molina</u>, 674 F.3d at 1112-13 (citations and internal quotation marks omitted).

The ALJ cited the appropriate standard and then explained in a very detailed opinion that

Plaintiff's subjective statements regarding the intensity, persistence, or functional limitations of

pain or other symptoms were not credible to the extent they suggested an inability to function in a

capacity greater than that found by the ALJ.  Tr. 21-22, 22-39.  The ALJ provided several reasons

in support of this finding including that (1) Plaintiff's impairments were long-standing and had

not previously prevented her from working; (2) the medical record did not support her assertion

that she had a sudden onset or flare-up of insomnia in the summer of 2012 or a worsening of

other conditions; (3) her allegations were inconsistent with her activities; (4) her testimony

regarding her job loss was inconsistent and showed that her insomnia played only a partial role in her cessation of work; (5) she exaggerated her symptoms; and (6) her treatments for insomnia were largely successful and Plaintiff overstated the functional consequences of the impairment.

A.  Longstanding Impairments Without Evidence of Exacerbation

Plaintiff first takes issue with the ALJ's findings that Plaintiff's impairments were longstanding and the record lacked evidence of exacerbation coinciding with her alleged August 2012 onset date.  Plaintiff does not deny that her impairments were chronic.  The record supports that conclusion.  E.g., Tr. 375 (June 13, 2012 chart note by Dr. Jonathon Park, M.D. stating that Plaintiff has had underlying chronic insomnia for years); Tr. 330 (Nov. 26, 2012 chart note by Family Nurse Practitioner (FNP) Cynthia Wornstaff, stating that Plaintiff reported that her insomnia started ten years ago); Tr. 296 (Dec. 5, 2012 emergency department chart note showing that Plaintiff stated she had had difficulty sleeping for years); see also Tr. 27-30 (discussion by ALJ, with citations to the record, of Plaintiff's physical complaints both before and after the alleged onset date).[1]

Instead, Plaintiff argues that contrary to the ALJ's conclusion, the evidence shows "that her chronic insomnia flared in summer 2012, causing hallucinations and paranoia that eventually resulted in termination from her fifteen-year career" in August 2012.  Pl.'s Brief 15.  She contends that her chronic conditions combined with the flare-up of her insomnia in the summer of 2012 to cause her to become disabled.

---

[1]  Plaintiff does not contend that her physical impairments became more acute at or near the alleged onset date or worsened to a significant degree other than to assert that her long-standing chronic pain was exacerbated by weight gain caused by prescription medication.  Pl.'s Brief 19.

Plaintiff cites to several places in the record where practitioners noted her anxiety, depression, and similar conditions in the time period relatively close to her alleged onset date. Pl.'s Brief 15-16.  She also notes that she did tell her providers during this time that her insomnia had worsened recently.  She further cites to a time in December 2012 when her treating physician, Dr. Joseph Amavisca, M.D., referred her to the emergency department for hallucinations caused by severe insomnia.

The ALJ discussed these records.  Tr. 22-26, 31-25.  The ALJ noted that in June 2012, Plaintiff told her treating provider Dr. Park that she had had insomnia for years.  Tr. 22-23 (citing Tr. 375). However, Plaintiff made no mention of any recent increase in insomnia symptoms.  Tr. 375-76.  As the ALJ explained, the chart note from that visit lists insomnia as one of four medical issues with no suggestion that it was recently acute or any more serious than any of her other impairments at the time.  Id.  At her follow-up appointment in late July 2012, she told Dr. Park that she had not been sleeping well and had difficulty falling and staying asleep, but, she reported that she had run out of Ambien, her prescription sleeping medication, two weeks earlier. Tr. 23 (citing Tr. 371-74).  Although this is precisely the time period when Plaintiff asserts her insomnia symptoms were escalating, the ALJ explained that without Ambien, it would be expected for Plaintiff to have a recurrence of insomnia symptoms.  Tr. 23.  Furthermore, despite her later description of an inability to function well at this time, the ALJ noted that Dr. Park described Plaintiff as appearing well and being in no acute distress.  Tr. 23 (citing Tr. 371-74). Her mood and affect were normal and her reflexes and sensation continued to be intact.  Id.  Dr. Park continued Plaintiff on Ambien but indicated she could take a double dose if she did not improve.  Tr. 372.

The ALJ explained:

> The claimant, therefore, does not tell her treating physician of any particular change in her condition, or the onset of symptoms, that would be consistent with the beginning of her allegedly disabling condition.  At most, she refers to not sleeping well, and even this is in the context of her running out of an apparently effective sleep medication.  Instead of appearing irrational or in pain, she appeared comfortable and oriented.  She made no reference to symptoms of anxiety, depression, or mood swings, and was notably silent regarding irrational or paranoid thinking.  She did not refer to fatigue as a discrete matter, nor did she claim to have diminished abilities in concentrating or attending, as she later claimed she had developed at this point.

Tr. 23.

The ALJ also discussed the August 27, 2012 record by Dr. Amavisca in which Plaintiff reported not having had "restful" sleep for the past three days.  Tr. 24 (citing Tr. 368-70).  The ALJ explained that the apparent purpose of Dr. Amavisca's examination was not for the onset of insomnia or any new symptoms but was instead to follow-up on joint pain, including stiffness in her hands, and anxiety.  Id.  She complained of decreased quality of life due to generalized body pains and only then complained of continued insomnia, noting the lack of restful sleep for three days.  Id.  But, the ALJ noted, she made no particular reference to any functional consequences of insomnia and reported no increase in anxiety or mood swings, or any decrease in cognition.  Id. Dr. Amavisca observed that Plaintiff appeared anxious and distracted, Tr. 369-70, but, as the ALJ noted, he described her mood and affect as normal.  Tr. 24 (citing Tr. 368-70).  Dr. Amavisca observed that she was oriented to person, place, and time.  Tr. 370.  The ALJ also stated that like Dr. Park the previous month, Dr. Amavisca listed insomnia only as one of four impairments with no particular focus on it as opposed to the other impairments.  Tr. 24.

The ALJ found that almost three months passed before Plaintiff next presented to a

medical provider specifically for insomnia issues.  Tr. 24.  Plaintiff does not dispute this finding.

At a November 26, 2012 appointment with FNP Wornstaff, Plaintiff wanted to address what she

referred to as chronic insomnia for ten years, which she asserted had increased in the last four

months.  Id. (citing Tr. 330-32).  Plaintiff also reported chronic pain.  Id.  Despite her complaints,

the ALJ noted, FNP Wornstaff's mental status examination was mostly normal with only a

notation of an anxious mood.  Id. (citing Tr. 331).  Plaintiff was oriented to person, place, and

time, she appeared well-developed and well-nourished, and was in no distress.  Id.  Her behavior,

judgment, thought content, cognition, and memory, were all normal.  Id.  (citing Tr. 331).

Plaintiff saw Dr. Amavisca again on December 4, 2012.  Tr. 360-62.  Although this was

only eight days after seeing FNP Wornstaff, Plaintiff reported she had been experiencing extreme

sleep loss as well as anxiety and shakes.  Tr. 360.  She further reported to Dr. Amavisca that she

had been self-reducing her opiod use but was using medical marijuana.  Id.  Her husband was

concerned with her emotional lability.  Id.  Despite her reports, Dr. Amavisca observed her to be

in no acute distress and appearing well.  Tr. 361.  He noted, however, that while she was oriented

to person, place, and time, she still appeared agitated, excessive, crying, anxious, and despairing.

Tr. 362.

The next day, Plaintiff went to the emergency room.  Tr. 296-98.  According to Plaintiff,

Dr. Amavisca referred her to the emergency department for a psychiatric evaluation.  Id.  Plaintiff

reported difficulty sleeping for years, but "perhaps more so over the last 4 to 5 months."  Id.

Plaintiff's husband reported that Plaintiff had been hallucinating because of it.  Id.

However, on examination, she denied current hallucinations, reported self-tapering off of

opiod medication with her last dose the previous day, and the use of marijuana.  Tr. 296.  She

was found to be "quite alert" and lucid, interacted appropriately, was non-delusional, and not

self-destructive. Tr. 297. The emergency department physician consulted with Dr. Amavisca as

well as the on-call psychiatrist, and concluded that Plaintiff would benefit from an antipsychotic

medication to help her sleep. Tr. 297. The provider concluded this was a nonemergent condition

and encouraged her to contact her primary care provider and undergo a mental health evaluation

at a local clinic later that week. Id.

Two days later, Plaintiff reported to Dr. Amavisca that she was "doing much better" and

had been able to get some sleep. Tr. 357. She was in no acute distress. Tr. 358. Her mood and

affect were normal and she was oriented to person, place, and time. Tr. 359.

Plaintiff correctly notes that various providers occasionally found her mood to be anxious

or depressed in 2012. Nonetheless, the ALJ's finding that the record does not confirm any acute

"flare" or exacerbation of her insomnia or other conditions in the time frame of her alleged onset

date, is well-supported. Even in those instances where Plaintiff reports that her insomnia was

"perhaps" worse over the "last four to five months," there is no observation by any medical

provider of paranoia, hallucination, or other cognitively impaired thinking as Plaintiff claims. It

is clear that Plaintiff has a different analysis of the record than the one provided by the ALJ.

However, a reviewing court may not "second guess" a reasonable interpretation by the ALJ when

it is supported by substantial evidence, even when the ALJ's interpretation of the record may not

be the only reasonable one. Rollins v. Massanari, 261 F.3d 853, 857 (9th Cir. 2001). The ALJ

did not err in concluding that Plaintiff's allegations regarding an acute worsening of symptoms in

the summer of 2012 is not supported by the medical record.

/ / /

12 - OPINION & ORDER

B.  Activities of Daily Living

The ALJ found that Plaintiff's activities were inconsistent with her allegations of disabling limitations.  The ALJ described daily activities that Plaintiff reported in her October 1, 2012 function report, including tidying up her kitchen, reclining, checking in with an elderly neighbor, using the computer for thirty to sixty minutes, watching television, and spending thirty minutes preparing meals and another thirty minutes washing dishes.  Tr. 36.  The ALJ also noted that Plaintiff had reported vacuuming, doing laundry, shopping once per week for thirty to forty-five minutes, and visiting neighbors and friends a few times per month.  Id.  The ALJ noted Plaintiff's statement that she had been unable to garden for over a year.  Id.  He also cited to Plaintiff's husband's October 26, 2012 function report that Plaintiff's activities included acting as his backup when his own disabilities prevented him from engaging in an activity.  Id.  According to her husband, Plaintiff took him to doctor's appointments, prepared meals for them both, cleaned with difficulty, and washed dishes with taking a break.  Id.  Her husband also reported that they shopped together twice per week for one to three hours, when they felt able to do so.  Id.  In a more recent report of her husband's, the ALJ noted, Plaintiff was reported to be performing some chores such as cooking, laundry, cleaning, and mowing.  Id.  She shopped once per week for one to three hours with help, and could pay bills and conduct other financial tasks.  Id.  For recreation, she mostly watched television and she gardened and fished, although it was hard to do.  Id.

The ALJ  noted that in her reports to her providers, Plaintiff revealed performance of a "greater level of functioning than she directly admits."  Tr. 36.  Although it was before her alleged onset date, the ALJ cited to Plaintiff's November 2011 request for more migraine

medication because she was planning to travel to Southern California and did not want to run out. Id. (citing Tr. 383). The ALJ also cited to another report of a trip to California, this time in December 2012, after her alleged onset date. Id.; see Tr. 354 (Dec. 18, 2012 chart note by Dr. Amavisca noting Plaintiff's plans to vacation to California). The ALJ noted that despite claims of acute anxiety and pain, in February 2013, Plaintiff reported to Dr. Toresa Martell, D.O., in an outpatient psychiatric appointment, that she had been able to drive to a neighboring community by herself and "did fine," despite some feelings of panic. Id. (citing Tr. 393). She went out and had dinner with a friend. Id. She told Dr. Martell in May 2013 that she was engaging in more outdoor activity, including gardening. Id. (citing Tr. 413). In July 2013, Plaintiff told Dr. Martell that she had more energy, was slowly experiencing improvement in her symptoms, and had been involved "at the fair" and in other social activities. Id. (citing Tr. 408). Finally, the ALJ remarked that despite her alleged disabling symptoms from sciatica, fatigue, sleep deprivation, and anhedonia, as of January 2014 she was walking three to four miles per day. Id.; see also Tr. 484.

Plaintiff argues that the ALJ erred because "the evidence reveals significantly limited impairments with waxing and waning symptoms consistent with her mental health diagnoses." Pl.'s Brief 20. She cites to no records in support of this assertion. She correctly argues that she does not need to prove that her impairments "wholly preclude" her from tasks and self-care. She argues that her testimony that she spends most days watching television or listening to the radio does not contradict her allegations of disability.

Plaintiff's testimony at the hearing and her reports of activities in her written function report are mostly consistent with each other. And, as expected, they suggest that she is capable

of engaging in some limited activities but cannot sustain many of them. However, as the ALJ explained, the activities she reported to her providers undermine her testimony and her functional descriptions in her written reports.

Vacation plans to California, engaging in various social activities, and increased physical activity such as gardening and walking several miles per day, are reasonably suggestive of an activity level greater than she alleges. The ALJ did not err in finding that Plaintiff's activities of daily living are inconsistent with her allegations of disability.

C. Statements Regarding Job Loss

At the hearing, Plaintiff testified that she became disabled in August 2012 when, after experiencing severe insomnia beginning in July 2012, she had irrational thinking and paranoia, causing her to make an error at work for which she was terminated. Tr. 61. Id. The ALJ found that Plaintiff's testimony about why she lost her job was not consistent with statements she had made to various providers. Tr. 24. The ALJ found these inconsistent statements to undermine her credibility.

In support of this finding, the ALJ cited to several documents in the record. In December 2012, Plaintiff reported to Gladys Shade, L.C.S.W., that she lost her job of fifteen years after "years of stress leading to increased insomnia and lack of functioning[.]" Tr. 326. She reported having been threatened by people and being yelled at. Id. She noted her chronic insomnia and asserted it had gotten worse starting in June. Id. Plaintiff told Shade that "years of this stress on my job has traumatized me and I just want to get back to myself, this has changed me." Id. She suggested she had developed PTSD symptoms from her job. Id. She also mentioned that she went one or two weeks without any sleep. Id. In January 2013, she reported that she had been

unable to work for the past six months, but she now included chronic pain as a cause in addition to the "inability to sleep due to mood swings." Tr. 348. In October 2013, she told David Bertapelle, L.C.S.W., that "difficulty with sleep, paranoia, and irrational thinking" contributed to her losing her job. Tr. 435. She added, however, that the "job was getting to me" because she dealt with an angry public. Id. In November 2013, in an appointment with Sophia Cording, a Psychiatric Mental Health Nurse Practitioner (PMHNP), Plaintiff reported having increased stressors at work, along with worsening insomnia which caused her to make errors at her job, resulting in her being fired. Tr. 421.

The ALJ noted that in her September 21, 2012 disability benefits application, Plaintiff stated that she stopped work not just due to lack of sleep or even pain, but because of medication side effects. Tr. 24 (citing Tr. 202). In responding to the question of why she stopped working, she wrote: "Difficulty performing the job due to pain, effects of medication, and lack of sleep." Tr. 202. She explained that the "constant pain and medications caused me to make mistakes and errors in judgment that ultimately led to my being terminated by my employer." Id. She further noted that over the previous two to three years, she had been unable to perform some job duties such as physical inventories. Id. Approximately nine days later, Plaintiff stated she was fired for making a mistake and trying to cover it up. Tr. 24 (citing Tr. 219 (Oct. 1, 2016 Function Report)).

In his October 26, 2012 Function Report, which the ALJ discussed, Plaintiff's husband reported that Plaintiff "lied and was fired." Tr. 227. He also said, in response to a question about Plaintiff's ability to handle money, that she was fired for a "Judgement call (B.S. setup)." Tr. 225. The question asked if the disabled person's ability to handle money had changed since the

16 - OPINION & ORDER

illnesses, injuries, or conditions began.  Id.  Plaintiff's husband checked both the "Yes" and "No"

boxes, with the additional comments of "Officially" written next to the "Yes" box, and "In Truth"

written next to the "No" box.  Id.  He noted that Plaintiff used to handle millions of dollars for

the County and she was still very competent with managing money, although he added that no

sleep for a week will affect anyone's ability.  Id.  The ALJ noted that in remarking on Plaintiff's

termination, Plaintiff's husband did not indicate that insomnia or any other impairment was an

issue.  Tr. 25.

     The ALJ characterized these records as exhibiting "varying explanations for her cessation

of work[.]" Tr. 25.  He noted that Plaintiff often referred to factors such as work-related stress or

pain and not insomnia as a primary cause.  Id.  Based on this observation, he found that her

insomnia played only a partial role in her cessation of work.  Tr. 26.  The evidence, he concluded,

was inconsistent with her hearing testimony where she attributed her termination to severe

insomnia beginning in July 2012, creating irrational thinking and paranoia, causing her to make

an error for which she was fired.

     Plaintiff argues that the reports cited by the ALJ are actually "consistent with one another,

consistent with the overall record, and consistent with Plaintiff's reported mental impairments."

Pl.'s Reply 3.  This is a conclusory assertion which offers no explanation for why Plaintiff

believes the reports are consistent in the ways Plaintiff argues.  In my opinion, the record

indicates some consistency in that Plaintiff frequently reported work-related stress and tension,

increased sleeplessness, and pain as contributors to her making a mistake at work for which she

was fired.   Nonetheless, the ALJ's finding that the records show insomnia as only a part of the

mix is a rational interpretation.  Moreover, Plaintiff's husband's characterization of her

17 - OPINION & ORDER

termination as "B.S." and his assertion that "in truth" her ability to handle money had not

changed since the condition began, undermines her assertion that her insomnia severely impacted

her ability to think rationally and made her paranoid.  Thus, the ALJ's conclusion that her hearing

testimony was at least partially contradicted by the evidentiary record is supported by substantial

evidence in the record and was not error.

D.  Exaggeration of Symptoms

The ALJ noted that Plaintiff had made the "incredible assertion" that she had almost no

sleep in the previous fifteen days.  Tr. 22; see also Tr. 24 (noting that Plaintiff told Shade she

went one or two weeks without any sleep); Tr. 34 (noting that Plaintiff told Cording she had a

history of going eleven, twelve, or thirteen days with no sleep).  The ALJ noted that State agency

reviewing psychologist Bill Hennings, Ph.D., opined that if a person truly went without sleep for

six or seven days in a row, the person would become psychotic.  Tr. 37-38.  "Consequently," the

ALJ found, Plaintiff "was not fully consistent in her statements about the extent of her

limitations."  Tr. 38.

As noted above, Plaintiff went to the emergency department on December 5, 2012

because, she told staff there, Dr. Amavisca referred her to get a psychiatric evaluation.  Tr. 296.

The emergency department records show that she "denie[d] any sleep x 15 days."  Tr. 305.[2]

However, as the ALJ noted in his discussion, while Plaintiff's husband reported that Plaintiff had

---

[2]  The ALJ mistakenly noted that Plaintiff had made the "no sleep in the prior 15 days" assertion to Dr. Martell in January 2013.  Tr. 22 (citing Tr. 399).  In fact, Dr. Martell's report of her January 29, 2013 outpatient psychiatric session with Plaintiff refers to Plaintiff's report of her previous "emergency department visit after 15 days with almost no sleep."  Id.  Dr. Martell's report makes clear that the initial report of no sleep in the prior fifteen days was made during the December 5, 2012 emergency department visit.  The ALJ's error is of no consequence.

been hallucinating because of her difficulty sleeping, she denied current hallucinations, was found to be "quite alert" and lucid, interacted appropriately, was non-delusional, and not self-destructive. Tr. 296-97. The emergency department record shows this was a nonemergent condition. Tr. 297. Although she was prescribed an antipsychotic medication, it was to help her sleep "today," not to treat psychotic symptoms. Additionally, Plaintiff's emergency room visit in which she alleged she had not slept in fifteen days, was only nine days after her November 26, 2012 appointment with FNP Wornstaff. Although Plaintiff referred to her chronic insomnia at that visit, she did not state that she had not slept for six days. She was noted to be anxious, but otherwise was oriented to person, place, and time, and had normal behavior, judgment, thought content, cognition, and memory. Tr. 330-32.

Dr. Hennings's uncontradicted testimony about the effects of prolonged sleeplessness combined with the medical records evidencing no active psychosis allowed the ALJ to determine that Plaintiff's allegations of not sleeping for one to two weeks at a time were exaggerated. As previously stated, the ALJ may rely on ordinary techniques of credibility evaluation in assessing a Plaintiff's subjective testimony. Molina, 674 F.3d at 1112. The ALJ did not err in concluding that Plaintiff's testimony on this issue undermined her credibility.

E. Insomnia Treatments and Functional Consequences

The ALJ also discounted Plaintiff's credibility because he found that she was successful in treating her insomnia and she overstated the functional consequences of that impairment. Tr. 26. The ALJ found that Plaintiff reported better response to medications such as Ambien or Xanax in her reports to providers than she gave in her testimony. Id. And, even when she reported disrupted sleep, providers found few indications of significant consequences. Tr. 26-27.

The ALJ noted that Plaintiff reported successfully treating her insomnia with Ambien for a period of time. E.g., Tr. 330 (Nov. 26, 2012 chart note by FNP Wornstaff noting Plaintiff's report that Ambien worked well for a number of years until she was told not to take it); Tr. 375 (similar report to Dr. Park in June 2012 noting she was taken off Ambien because it was contraindicated with her use of narcotic sedative medication). Even though she alleged it was not effective at times, she reported in July to October 2013 that Ambien was helping her. Tr. 408 (July 24, 2013 report to Dr. Martell that she was continuing to sleep appropriately "seven to eight hours with 5 mg of Ambien"); Tr. 424-26 (Aug. 22, 2013 Coos County Mental Health Report noting successful treatment of insomnia with Ambien); Tr. 433 (Oct. 7, 2013 report to Cording that Plaintiff had "increased hours of sleep with her current dose of Ambien" and was sleeping approximately seven hours per night).

The ALJ cited additional records reflecting Plaintiff's reports of increased sleep at other times. Tr. 26 (citing Tr. 354 (Dec. 18, 2012 report to Dr. Amavisca that she was getting better but still unhappy with four hours of sleep per night); Tr. 351 (Jan. 2, 2013 report to Dr. Amavisca that she was "doing much better"); Tr. 396 (Feb. 11, 2013 report to Dr. Martell that she was sleeping approximately six hours per night, even with pain and depression); Tr. 393 (Feb. 25, 2013 report to Dr. Martell that her sleep had been improving; she was averaging four to six hours of sleep night and more often six)). Finally, the ALJ cited to her report not long before her hearing that she slept eights hours on Xanax. Id. (citing Tr. 480 (Feb. 10, 2014 report to Cording who indicated she would switch Plaintiff from Ambien to Xanax)).

After discussing these records, the ALJ found that even when Plaintiff's sleep was allegedly disrupted, providers found few indications that the disruption had any significant

consequences. In support, the ALJ cited to Dr. Martell's records which noted Plaintiff's euthymic affect and intact cognitive functioning.  Tr. 26.  When Plaintiff first began treating with her, Dr. Martell observed a dysphoric affect, but still found her cognition intact.  Tr. 399-403 (Jan. 29, 2013 chart note of intake interview:   "Affect is dysphoric and congruent with stated mood"; no psychotic symptoms; noting "[c]ognition, she is alert throughout the interview[,]" was oriented to person, place, time, and situation, was able to abstract, and had above average intelligence); Tr. 397 (Feb. 11, 2013 chart note:  "Affect is dysphoric, a bit blunted and congruent with stated mood"; "Cognition, she is alert and oriented").  Plaintiff's mood quickly improved, however, because only two weeks later, Dr. Martell noted a euthymic mood.  Tr. 393 (Feb. 25, 2013 chart note: "Affect is blunted but euthymic for the most part and appears improved"; "Cognition, she is alert and oriented x4").  This improvement continued for months.  Tr. 391 (Apr. 22, 2013 chart note:  "Affect is blunted, but euthymic for the most part"; "[n]o psychotic symptoms"; "[c]ognition within normal limits"); Tr. 414 (May 22, 2013 chart note: "[a]ffect is mildly blunted, full range and congruent"; "Cognition grossly within normal limits"); Tr. 411 (June 24, 2013 chart note: "Affect is dysphoric but improved considerably, brightened and engaging during the session when husband was out of the room";' "Cognition within normal limits"); Tr. 408 (July 24, 2013 chart note: "Affect is improved, fuller range, brighter affect overall"; "Cognition within normal limits").

Plaintiff argues that the "evidence does not show control or improvement with treatment." Pl.'s Brief 17.   The record does not support Plaintiff's position.  Instead, the record shows decreased insomnia on Ambien, Xanax, and other medications with reports by Plaintiff to her providers that her sleep was improved.  And, even when she was struggling, her mood remained

relatively non-depressed and positive and she showed no signs of cognitive impairment.

Therefore, the ALJ did not err in concluding that Plaintiff's subjective testimony was inconsistent

with her treatment and functional capacity as shown in the medical records.

F.  Summary Regarding Credibility

The ALJ supported his credibility determination with a thorough evaluation of the

evidence and concluded that Plaintiff's subjective allegations were not credible.  The reasons

provided, including conflict with the medical evidence, inconsistent with daily activities,

inconsistent testimony regarding the role insomnia played in her termination, and exaggerated

testimony, are clear and convincing and supported by substantial evidence in the record.  The

ALJ's credibility determination was not in error.

II.  Dr. Amavisca's Opinion

Dr. Amavisca saw Plaintiff beginning in late August 2012.  Tr. 368-70.  He did not see

her again until December 2012.  Tr. 360-62.  He saw her two or three times in December 2012,

three times in January 2013, once in April 2013, once in June 2013, and once in January 2014.

Tr. 338-62, 462-68.[3]  On or about January 22, 2013, Dr. Amavisca wrote a "To Whom it May

Concern" letter addressing Plaintiff's symptoms and care.  Tr. 318.  He wrote that she had been

presenting with "many different psychiatric issues" which caused her to have a "severe loss of

sleep, anxiety and severe depression."  Id.  She had tried several medications to help control

"these mental issues" but had yet to find one which resolved them.  Id.  He opined that she had

---

[3]  As to the December 2012 visits, he saw her on December 4, 2012 and again on
December 18, 2012.  Tr. 360-62, 354-56.  It is unclear if Dr. Amivisca or another provider at
North Bend Medical Center saw her on December 7, 2012 because there is no provider name on
the chart note.  Tr. 357-59.

been unable to work due to these psychiatric conditions.  Id.  He noted reports by her husband

that Plaintiff had "not been herself at all," had been depressed, and was not "the person she used

to be."  Id.  Dr. Amavisca wrote that Plaintiff was sleeping only three to four hours each night

and "[w]ith all of these issues together[,] she has been unable to function mentally throughout the

day to hold a job."  Id.

Almost one year later, in December 2013, Dr. Amavisca completed a functional report in

which he recorded Plaintiff's diagnoses to be anxiety, arthritis, asthma, depression, and chronic

pain.  Tr. 454.  He opined that her insomnia, which he identified as being related to her chronic

pain, created "day time somnolence" which would interfere with her ability to work full-time,

eight hours per day, five days per week.  Tr. 455.  He also noted her difficulties sitting and

standing for prolonged periods of time, again related to her chronic pain.  Id.  Then, in a checklist

mental residual functional capacity evaluation, he found her markedly limited in the ability to

perform activities within a schedule, maintain regular attendance, and be punctual within

customary tolerances, as well as markedly limited in her ability to travel to unfamiliar places or

to use public transportation.  Tr. 458-60.  He found her moderately limited in the ability to

complete a normal workday and workweek without interruption from psychologically based

symptoms and to perform at a consistent pace without an unreasonable number and length of rest

periods.  Id.  As to seventeen other abilities, he found no evidence of any limitation.  Id.

The ALJ rejected Dr. Amavisca's January 2013 opinion that Plaintiff could not work.  Tr.

39.  The ALJ found that Dr. Amavisca had only a minimal treating relationship at the time he

issued that opinion because he had been seeing her for only a few months.  Id.  He also found that

coming so soon after her alleged onset date, the opinion could not reflect the benefits of

psychiatric treatment and improvement in control of her insomnia.  Id.  He also found that it did

not reflect her overall functioning.  Id.  The ALJ observed that Plaintiff's own concurrent

description of her abilities was not consistent with the degree of limitation rendered by Dr.

Amavisca.  Id.  He also noted that Dr. Amavisca's opinion referred primarily to psychiatric

symptoms and he was a family practitioner and not a mental health expert.  Id.  Finally, the ALJ

explained that Dr. Amavisca made a vocational conclusion without defining what he meant by

"work."  Id.

       The ALJ also rejected Dr. Amavisca's December 2013 assessment because it was

inconsistent with the overall record and was poorly supported by appropriate diagnostic signs and

findings.  Tr. 40.  The ALJ found that Dr. Amavisca accepted Plaintiff's statements that she

would have problems with prolonged sitting ro standing due to chronic pain, even though she had

been able to work after the onset of the impairments allegedly impeding her sitting and standing

abilities.  Id.  The ALJ further noted that Dr. Amavisca cited to no imaging, clinical signs, or

detailed description of Plaintiff's symptoms to support his marked limitations.  Id.  And, the ALJ

explained, Plaintiff's allegations of severe pain are inconsistent with her testimony and with her

unremarkable medical record since the alleged onset date.  Id.  The ALJ also found that Dr.

Amavisca's report was internally inconsistent in that he found no evidence of limitation in

"practically every area of psychological functioning," but then assessed moderate limitation in

her ability to complete a normal workweek due to psychological symptoms.  Id.  Additionally,

the ALJ explained that Dr. Amavisca's finding of a marked limitation in the ability to perform

within a work schedule was unsupported by any specific basis other than Plaintiff's "own self-

reporting."  Id.  The ALJ noted there had been no previous problems with this ability.  Id.  The

24 - OPINION & ORDER

finding was also inconsistent with Plaintiff's ability to be compliant with office visits and

recommendations, as Dr. Amavisca himself reported.  Id.  This indicated an adequate ability to

maintain a schedule.  Id.  The ALJ concluded:

> the moderate and particularly marked limitations noted are not supported by the
> claimant's work history, subsequent activities of daily life, and a routine history of
> physical and psychological treatment.  In these circumstances, despite his status as
> a treating provider, his conclusions as to her abilities and limitations must defer to
> the better supported and explained conclusions of the state agency consultants.

Id.

Social security law recognizes three types of physicians:  (1) treating, (2) examining, and

(3) nonexamining.  Holohan v. Massanari, 246 F.3d 1195, 1201-02 (9th Cir. 2001); Lester v.

Chater, 81 F.3d 821, 830 (9th Cir. 1996).  Generally, more weight is given to the opinion of a

treating physician than to the opinion of those who do not actually treat the claimant.  Id.; 20

C.F.R. § 1527(c)(1)-(2).

If the treating physician's medical opinion is supported by medically acceptable

diagnostic techniques and is not inconsistent with other substantial evidence in the record, the

treating physician's opinion is given controlling weight.  Orn v. Astrue, 495 F.3d 625, 631 (9th

Cir. 2007); Holohan, 246 F.3d at 1202.  If a treating physician's opinion is not given "controlling

weight" because it is not "well-supported" or because it is inconsistent with other substantial

evidence in the record, the ALJ must still articulate the relevant weight to be given to the opinion

under the factors provided for in 20 C.F.R. § 1527(d)(2).  Orn, 495 F.3d at 631.

If the treating physician's opinion is not contradicted by another doctor, the ALJ may

reject it only for "clear and convincing" reasons.  Id. at 632.  Even if the treating physician's

opinion is contradicted by another doctor, the ALJ may not reject the treating physician's opinion

without providing "specific and legitimate reasons" which are supported by substantial evidence in the record.  Id.

Plaintiff argues that the ALJ erred in rejecting Dr. Amavisca's opinion.  She maintains that the overall record supports Dr. Amavisca's opinion which she contends is consistent with those of other treating providers.  In support of her argument, Plaintiff notes that the ALJ discredited both Plaintiff and Dr. Amavisca because Dr. Hennings opined that if Plaintiff had truly gone without sleep for as long as she alleged, she would have become psychotic.  Plaintiff argues that the record shows she did experience psychotic symptoms from sleeplessness for which Dr. Amavisca referred her for emergency care.  This is an inaccurate statement of the record, however.  In the December 5, 2012 emergency department record, there is no indication that anyone other than either Plaintiff or her husband reported that Dr. Amavisca had sent them there.  Tr. 296.  And, it was Plaintiff's husband who reported that she had been hallucinating.  Tr. 296.  The ALJ found both Plaintiff and her husband not credible, and Plaintiff makes no challenge to the ALJ's credibility finding regarding her husband.  Furthermore, as previously explained, the emergency department found her alert, lucid, interacting appropriately, and non-delusional.  Tr. 296-97.  The antipsychotic medication was prescribed to help her sleep, not to address an active psychosis.  Id.

Plaintiff notes that Dr. Martell later stated that Plaintiff required Zyprexa to treat severe insomnia which was leading to "some mild psychotic manifestations," and that she further recommended that Plaintiff continue on the medication to treat a "questionable underlying psychotic or mood related disorder that actually requires an antipsychotic."  Tr. 413.  Plaintiff argues that this shows support for Dr. Amavisca's opinion.  In the May 2013 chart note, Dr.

Martell refers to "mild" psychotic manifestations which had occurred in the past when the Zyprexa had originally been prescribed to treat insomnia.  But, given the emergency department record, there were no psychotic manifestations noted by any provider there and thus, any report was by Plaintiff or her husband who are both non-credible sources.  And, as to Dr. Martell's suggestion that the medication may be required to treat a "questionable underlying psychotic or mood related disorder," it is notable that at this same visit, as with all her visits, Dr. Martell found "[n]o psychotic symptoms."  Tr. 414.  Thus, Dr. Martell's records support the ALJ and his reliance on Dr. Hennings's opinion about the effects of prolonged sleeplessness.

Plaintiff fails to offer a convincing argument that the ALJ erred in rejecting either of Dr. Amavisca's opinions.  An ALJ may appropriately consider the length of a treating relationship in evaluating the weight given a treating provider's opinion.  See 20 C.F.R. § 404.1527(c)(2)(i), (ii) (weight accorded a treating physician's opinion depends on the length of the treatment relationship, the frequency of visits, and the nature and extent of treatment received).  Here, Plaintiff established care with Dr. Amavisca only after her alleged onset date in August 2012, and at the time of his January 2013 opinion, he had seen her only a handful of times.  Furthermore, as discussed in the section above addressing Plaintiff's credibility, Plaintiff experienced improvement in her symptoms and Dr. Amavisca's January 2013 opinion could not have accounted for her later treatment.

Opinions from specialists related to that person's speciality are afforded more weight. Benecke v. Barnhart, 379 F.3d 587, 594 n.4 (9th Cir. 2004); 20 C.F.R. § 404.1527(c)(5).  There is no dispute that as a family practitioner, Dr. Amavisca is not a psychiatrist or mental health specialist.  The ALJ properly took this into consideration.  Additionally, the ALJ found that Dr.

Amavisca's January 2013 opinion contrasted with Plaintiff's own report of her functionality.  Just the prior month, she reported she was getting better sleep, even though she still was not sleeping as well as she would like.  Tr. 354.  On January 2, 2013, just three weeks before the January 22, 2013 opinion, she again reported that she was "doing much better," although still not getting a "full" night's sleep.  Tr. 351.   By February 11, 2013, only a couple of weeks after the opinion, she was getting six hours of sleep per night.  Tr. 396.

Additionally, her reports of depression and anxiety leading up to the January 22, 2013 opinion, were inconsistent.  Tr. 357 (Dec. 7, 2012 chart note referring to anxiety and sleep loss; noting normal mood and affect; no reference to acute depression); Tr. 354 (Dec. 18, 2012 chart note referring to anxiety and insomnia and normal mood and affect but no reference to acute depression); Tr. 351 (Jan. 2, 2013 chart note making no reference to acute depressive episode and noting Plaintiff's report of only intermittent anxiety now that she was taking medication); Tr. 348 (Jan. 9, 2013 chart note referring to Plaintiff's report of an increase in anxiety and noting abnormal mood for anxious, depressed, despairing, and more); Tr. 341 (Jan. 22, 2013 chart note referring to Plaintiff's repot of an increase in depression; no report of increased anxiety; noting abnormal mood for anxious, despairing, and more, but also noting that she was both not euphoric but not dysphoric).

Given Plaintiff's reports of increased sleep, intermittent anxiety, and inconsistent episodes of depression with an increase in symptoms only immediately prior to Dr. Amavisca's January 22, 2013 opinion, the ALJ did not err in finding that the opinion was inconsistent with Plaintiff's own reports of her functional limitations.

The ALJ also offered specific and legitimate reasons supported in the record to reject Dr.

28 - OPINION & ORDER

Amavisca's December 2013 opinion.  A treating physician's opinion may be rejected if based on a

non-credible claimant's subjective reports.  See Bayliss v. Barnhart, 427 F.3d 1211, 1217 (9th

Cir. 2005) (ALJ did not err in rejecting opinions based on subjective complaints); Andrews v.

Shalala, 53 F.3d 1035, 1043 (9th Cir. 1995) (medical opinion which is "premised to a large

extent upon the claimant's own accounts of his symptoms and limitations may be disregarded,

once those complaints have themselves been properly discounted.").  The ALJ properly found

that Dr. Amavisca's December 2013 opinion was largely based on Plaintiff's self-reports.  There

is no evidence in his chart notes of any imaging studies or objective mental evaluation testing, his

opinion is unsupported by any specific diagnostic signs or findings, and it is inconsistent with the

evidence in the record as a whole.  See, e.g., Tr. 340 (Apr. 3, 2013 chart note showing normal

musculoskeletal and neurologic findings); Tr. 356, 359, 362 (normal musculoskeletal and

neurologic findings in December 2012); Tr. 466-67 (June 4, 2013 chart note making no mention

of pain complaints; noting left shoulder pain as the only "active" joint pain problem; making no

reference to any joint pain condition in the assessment section).  The ALJ need not accept the

opinion of a doctor if it is inadequately supported by clinical findings.  Bayliss, 427 F.3d at 1217.

Additionally, it is reasonable to assume that someone with mental health problems so

severe as to preclude them from working, as Dr. Amavisca opined, would have a bevy of

psychological functional limitations.  Yet, Dr. Amavisca found that Plaintiff had no limitations in

seventeen of twenty categories of psychological functioning.  As the ALJ observed, this makes

his finding of a marked limitation in the ability to perform activities within a schedule, to

maintain regular attendance, and to be punctual within customary tolerances, inconsistent with

his other findings.  Internal inconsistency is a legitimate reason to give less weight to a medical

source.  See Rollins, 261 F.3d at 856 (upholding rejection of internally inconsistent medical opinion of a treating physician); Matney on Behalf of Matney v. Sullivan, 981 F.2d 1016, 1020 (9th Cir. 1992) (upholding rejection of internally inconsistent functional limitations rendered by physician).  Moreover, the limitations in this ability contrasted with Plaintiff's ability to be compliant with office visits and treatment.

The ALJ did not err in rejecting Dr. Amavisca's January 2013 and December 2013 opinions.  Furthermore, while the contrary opinions of state non-examining physicians cannot, by themselves, constitute substantial evidence justifying the rejection of a treating physician's opinion, they may constitute substantial evidence when consistent when other independent evidence in the record.  Tonapetyan v. Halter, 242 F.3d 1144, 1149 (9th Cir. 2001).  Here, for the reasons previously explained, the state agency physician opinions are consistent with the medical evidence, treatment record, and Plaintiff's reports.  The ALJ did not err in rejecting Dr. Amavisca's conclusion and deferring to the state non-examining practitioners.

III.  Counselor Bertapelle's Opinion

Plaintiff received counseling from social worker Bertapelle at Coos County Mental Health a handful of times between October 7, 2013 and January 29, 2014.  Tr. 435 (Oct. 7, 2013); 431 (Oct. 28, 2013); 427 (Nov. 19, 2013); 486 (Jan. 6, 2014); 483 (Jan. 29, 2014).  On January 29, 2014, Bertapelle completed a functional report like the one Dr. Amavisca completed in December 2013.  Tr. 470-76.  Bertapelle reported Plaintiff's symptoms as insomnia, lack of interest, lack of energy, lack of confidence, and thoughts of wanting to be dead.  Tr. 471.  He indicated that these symptoms made it hard for Plaintiff to keep a schedule and control her emotions which in turn would interfere with her ability to work full-time eight hours per day, five

days per week, without absences of greater than two days per month.  Id.

In the checkbox mental residual capacity form, he found Plaintiff markedly limited in several abilities: (1) understanding and remembering detailed instructions; (2) carrying out detailed instructions; (3) maintaining attention and concentration for extended periods; (4) performing activities within a schedule, maintaining regular attendance, and being punctual within customary tolerances; (5) sustaining an ordinary routine without special supervision; (6) completing a normal workday and workweek without interruption from psychologically based symptoms and performing at a consistent pace without an unreasonable number and length of rest periods; (7) traveling in unfamiliar places or using public transportation; and (8) setting realistic goals or making plans independently of others.  Tr. 474-76.  He found her moderately limited in the ability to work in coordination with or proximity to others without being distracted by them, in the ability to make simple work-related decisions, in the ability to accept instructions and respond appropriately to criticism from supervisors, and in the ability to maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness.  Id.  Otherwise, he found her not significantly limited.

The ALJ rejected Bertapelle's opinion.  First, the ALJ found that the opinion was inconsistent with the record which established, at most, moderate psychiatric symptoms.  Tr. 41.  Second, he noted that Bertapelle did not begin to see Plaintiff until October 2013 and thus, he had no "longitudinal history of substance" with Plaintiff.  Id.  Third, the ALJ found that Bertapelle's opinion was inconsistent with the findings of PMHNP Cording, particularly regarding Plaintiff's mental status examinations.  Id.  Fourth, he found that Bertapelle's opinions were inconsistent with Plaintiff's activity level and treatment history.  Id.  Finally, he noted that

Bertapelle was not an acceptable medical source.  Id.  In contrast, Dr. Hennings was a psychologist.  Id.  Thus, Bertapelle's findings had to defer to those of Dr. Hennings.

Plaintiff argues that the ALJ erred in rejecting Bertapelle's opinion.  Plaintiff contends that the ALJ may not discount the opinion simply because Bertapelle is not an "acceptable medical source," and that the ALJ failed to provide reasons germane to the witness in support of his finding.  Plaintiff suggests that contrary to the ALJ's finding, Bertapelle's opinion was consistent with Dr. Amavisca's opinion.  Additionally, Plaintiff contends that the ALJ provided no support for his assertion that if Bertapelle's opinion were true, Plaintiff would be unable to function in society.

Under social security regulations governing the weight to be accorded to medical opinions, "acceptable medical sources" include licensed physicians and licensed psychologists, but not social workers.  20 C.F.R. §§ 404.1513(a), (d).  Social workers fall into the "other sources" category.  Id.; Turner v. Comm'r, 613 F.3d 1217, 1223–24 (9th Cir.2010) (social workers are not considered an "acceptable medical source" but are "other sources" under the regulations).  Under Ninth Circuit law, evidence from "other sources" is considered  under the same standard as that used to evaluate lay witness testimony, meaning the ALJ may reject it for reasons germane to the witness.  Molina, 674 F.3d at 1111 (because physician's assistant was not an acceptable medical source, ALJ could discount physician's assistant's opinion for germane reasons); see also Sauvageau v. Colvin, No. 3:14-CV-01932-AA, 2016 WL 1222245, at *5-6 (D. Or. Mar. 25, 2016) (social worker is deemed a non-medical "other source"; affirming ALJ's rejection of social worker's opinion because ALJ provided reasons germane to the witness in support).

32 - OPINION & ORDER

In Social Security Ruling (SSR) 06-03p (available at 2006 WL 2329939), the Social Security Administration recognized that "[w]ith the growth of managed health care in recent years and the emphasis on containing medical costs, medical sources who are not 'acceptable medical sources,' such as nurse practitioners, physician assistants, and licensed clinical social workers, have increasingly assumed a greater percentage of the treatment and evaluation functions previously handled primarily by physicians and psychologists." Id. at *3.  The SSA stated that "[o]pinions from these medical sources, who are not technically deemed 'acceptable medical sources' under our rules, are important and should be evaluated on key issues such as impairment severity and functional effects, along with the other relevant evidence in the file." Id.

Factors for consideration of such other medical sources include:  (1) how long the source has known and how frequently the source has seen the individual; (2) how consistent the opinion is with other evidence; (3) the degree to which the source presents relevant evidence to support an opinion; (4) how well the source explains the opinion; (5) whether the source has a specialty or area of expertise related to the individual's impairment(s); and (6) any other factors that tend to support or refute the opinion.  Id. at *4-5.  Generally, the adjudicator "should explain the weight given to opinions from these 'other sources[.]'" Id. at *6.

The ALJ complied with the regulation and provided reasons germane to Bertapelle's testimony in support of his determination that the opinion was not entitled to any weight.  First, the ALJ did not rely solely on Bertapelle's status as a non-acceptable medical source.  It was one of several reasons he gave in support of his determination.  Second, the ALJ properly noted that Bertapelle issued his opinion after a fairly short period of time.  Bertapelle's assessment came after treating Plaintiff for only a few months and after only five visits.  Third, the ALJ noted that

Bertapelle's assessment conflicted with findings made by PMHNP Cording who was seeing Plaintiff at the same time as Bertapelle. The ALJ provided other reasons as well, but these are sufficient to show that the ALJ did not err in rejecting Bertapelle's opinion.

IV. Step Five Finding

Plaintiff argues that the ALJ erred at step five in concluding that she retained the RFC to perform other work. This argument assumes, however, that the ALJ erred in rejecting Plaintiff's credibility, in rejecting Dr. Amavisca's opinion, and in rejecting Bertapelle's opinion. Because the ALJ did not err in those findings, he did not err at step five.

CONCLUSION

The Commissioner's decision is affirmed.

IT IS SO ORDERED.

Dated this _____ day of _____, 2016


_____
Marco A. Hernandez
United States District Judge

34 - OPINION & ORDER